## UNITED STATES DISTRICT COURT
### DISTRICT OF MINNESOTA

Carla J. H.,

Case No. 20-cv-2035 (DSD/TNL)

      Plaintiff,

v.

**REPORT & RECOMMENDATION**

Kilolo Kijakazi,
*Acting Commissioner of Social Security*,[1]

      Defendant.

Edward C. Olson, Disability Attorneys of Minnesota, 331 Second Avenue South, #890, Minneapolis, MN 55401; and Meredith E. Marcus, Daley Disability Law PC, 601 West Randolph Street, Suite 300, Chicago, IL 60661 (for Plaintiff); and

Linda H. Green, Special Assistant United States Attorney, Social Security Administration, 1301 Young Street, Suite 350, Mailroom 104, Dallas, TX 75202 (for Defendant).

## I. INTRODUCTION

Plaintiff Carla J. H. brings the present case, contesting Defendant Commissioner of Social Security's denial of disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.* This matter is before the undersigned United States Magistrate Judge on cross motions for summary judgment, Plaintiff's Motion for Summary Judgment, ECF No. 24, and the Commissioner's Motion for Summary Judgment, ECF No. 32. These motions have been referred to the undersigned for a report and recommendation to the district court, the Honorable David S. Doty, District Judge for

---

[1] The Court has substituted Acting Commissioner Kilolo Kijakazi for Andrew Saul. A public officer's "successor is automatically substituted as a party" and "[l]ater proceedings should be in the substituted party's name." Fed. R. Civ. P. 25(d).

the United States District Court for the District of Minnesota, under 28 U.S.C. § 636 and D. Minn. LR 72.1.

Based upon the record, memoranda, and the proceedings herein, **IT IS HEREBY RECOMMENDED** that Plaintiff's motion be **GRANTED IN PART** and **DENIED IN PART**; the Commissioner's motion be **DENIED**; and this matter be remanded for further proceedings.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB asserting that she has been disabled since June 2015 due to a back injury, carpal tunnel syndrome, fibromyalgia, rheumatoid arthritis, degenerative joint and disc disease, anxiety disorder, "narcolepsy/daytime excessive somnia," and "autism spectrum disorder NOS." Tr. 98, 130. Plaintiff's applications were denied initially and again upon reconsideration. Tr. 96, 125, 128, 154.

Plaintiff appealed the reconsideration of her DIB determination by requesting a hearing before an administrative law judge ("ALJ"). Tr. 15, 176-78. The ALJ held a hearing in October 2019, and issued an unfavorable decision. Tr. 15-31, 41-74. After receiving an unfavorable decision from the ALJ, Plaintiff requested review from the Appeals Council, which was denied. Tr. 1-8.

Plaintiff then filed the instant action, challenging the ALJ's decision. Compl., ECF No. 1. The parties have filed cross motions for summary judgment. ECF Nos. 24, 32. This matter is now fully briefed and ready for a determination on the papers.

# III. ANALYSIS

## A.  Legal Standard

This Court reviews whether the ALJ's decision is supported by substantial evidence in the record as a whole.  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).  "[T]he threshold for such evidentiary sufficiency is not high."  *Id.*  "It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.* (quotation omitted); *see Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011) ("Substantial evidence means less than a preponderance but enough that a reasonable person would find it adequate to support the decision.").

This standard requires the Court to "consider both evidence that detracts from the [ALJ's] decision and evidence that supports it."  *Boettcher*, 652 F.3d at 863.  The ALJ's decision "will not [be] reverse[d] simply because some evidence supports a conclusion other than that reached by the ALJ."  *Id.*; *accord Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012).  "The court must affirm the [ALJ's] decision if it is supported by substantial evidence on the record as a whole."  *Chaney v. Colvin*, 812 F.3d 672, 676 (8th Cir. 2016) (quotation omitted).  Thus, "[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision."  *Perks*, 687 F.3d at 1091 (quotation omitted); *accord Chaney*, 812 F.3d at 676.

Disability benefits are available to individuals who are determined to be under a disability.  42 U.S.C. § 423(a)(1); 20 C.F.R. § 404.315.  An individual is considered to be disabled if she is unable "to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 404.1505(a).  This standard is met when a severe physical or mental impairment, or impairments, renders the individual unable to do her previous work or "any other kind of substantial gainful work which exists in the national economy" when taking into account her age, education, and work experience.  42 U.S.C. § 423(d)(2)(A); *see* 20 C.F.R. § 404.1505(a).

Disability is determined according to a five-step, sequential evaluation process. 20 C.F.R. § 404.1520(a)(4).

> To determine disability, the ALJ follows the familiar five-step process, considering whether: (1) the claimant was employed; (2) she was severely impaired; (3) her impairment was, or was comparable to, a listed impairment; (4) she could perform past relevant work; and if not, (5) whether she could perform any other kind of work.

*Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010).  In general, the burden of proving the existence of disability lies with the claimant.  20 C.F.R. § 404.1512(a).

Plaintiff's challenges all concern the ALJ's assessment of her residual functional capacity at step four, including the ALJ's evaluation of the intensity, persistence, and limiting effects of her subjective symptoms and the opinion evidence as well as certain limitations included by the ALJ.  *See Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) ("The fourth step in this analysis requires the ALJ to determine a claimant's [residual functional capacity]." (quotation omitted)).  Because of the nature of DIB, Plaintiff must establish that she was disabled before her insurance expired in December 2017 in order to

4

be entitled to benefits. *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009) (citing *Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006)); *see Michelle P. v. Berryhill*, No. 17-cv-4286 (HB), 2019 WL 1318352, at *1 n.4 (D. Minn. Mar. 22, 2019) ("[T]he date of last insurance is the last date an individual is eligible to receive DIB in view of [his] earnings record. Thus, the claimant must establish disability on or before that date in order to be entitled to DIB."), *aff'd sub nom.*, *Palmer v. Saul*, 798 F. App'x 44 (8th Cir. 2020) (per curiam).

### B. ALJ's Decision

In relevant part, the ALJ found that Plaintiff had the following severe impairments and that none of them individually or in combination met or equaled a listed impairment in 20 C.F.R. pt. 404, subpt. P, app.1:

> rheumatoid arthritis, fibromyalgia, chronic pain syndrome, right carpal tunnel syndrome, osteoarthritis of the left hand, lumbar degenerative disc disease, cervical degenerative disc disease, patellofemoral pain syndrome of the bilateral knees, generalized anxiety disorder, mood disorder, cluster B personality traits, paranoid personality disorder, social phobia, and autism spectrum disorder.

Tr. 18.

The ALJ found that Plaintiff had the residual functional capacity to perform light work[2] with additional limitations as follows:

---

[2] As set forth in the regulations,

> [l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.

she could frequently reach overhead and in all other directions bilaterally; frequently handle and finger bilaterally; never power grip, torque, or twist with her bilateral hands; occasionally climb ramps and stairs[;] never climb ladders, ropes, and scaffolds[;] occasionally balance on narrow, slippery, or erratically moving surfaces[;] occasionally stoop, kneel, crouch, and crawl; no exposure to unprotected heights or moving mechanical parts; no concentrated exposure to wetness, extreme cold, or vibration; routine and repetitive tasks, but not at a production rate pace such as that found in assembly line work; occasional interactions with supervisors, co-workers, and the public[;] and able to tolerate occasional changes in a routine work setting.

Tr. 20.

Based on Plaintiff's age, education, work experience, and residual functional capacity, the ALJ found that Plaintiff was capable of performing the representative jobs of merchandise marker, router, and photocopying machine operator.  Tr. 29-30. Accordingly, the ALJ concluded that Plaintiff was not under a disability through the date she was last insured.  Tr. 30.

### C. Understanding Fibromyalgia

Plaintiff begins by asserting that the ALJ erred in evaluating the impact fibromyalgia had on her residual functional capacity, pointing to places in the record she contends support the existence of fibromyalgia and the symptoms associated with and reflective of this disorder.

In *Leslie J. v. Berryhill*, this Court previously observed that

> fibromyalgia is a disorder with symptoms of muscle pain, chronic fatigue and other symptoms that cannot be objectively verified. *See, e.g.*, *Kelley v. Callahan*, 133 F.3d

---

20 C.F.R. § 404.1567(b).

6

583, 589 (8th Cir. 1998) ("Fibromyalgia, which is pain in the fibrous connective tissue components of muscles, tendons, ligaments and other white connective tissues, can be disabling.").  "A diagnosis is usually made after eliminating other conditions with similar symptoms, as there are no specific diagnostic tests for this affliction." *Tennant v. Apfel*, 224 F.3d 869, 870 n.2 (8th Cir. 2000) (per curiam); *see* Social Security Ruling 12-2p, *Titles II and XVI: Evaluation of Fibromyalgia*, 2012 WL 3104869, at *2-3 (Soc. Security Admin. July 25, 2012) [hereinafter SSR 12-2p]. "Fibromyalgia is a chronic condition which is difficult to diagnose and may be disabling." *Pirtle v. Astrue*, 479 F.3d 931, 935 (8th Cir. 2007).

No. 17-cv-1319 (TNL), 2018 WL 4603278, at *20 (D. Minn. Sept. 25, 2018).

The existence of Plaintiff's fibromyalgia is not in dispute.  The ALJ specifically found that Plaintiff's fibromyalgia was a severe impairment.  Tr. 18; *see also* Tr. 21 (noting "[t]he record supports a finding of . . . fibromyalgia"), ("The claimant has a history of a diagnosis of fibromyalgia with diffuse hand pain and multiple arthralgias predating her alleged onset date."); *see, e.g.*, Tr. 624 (fibromyalgia diagnosis in January 2017), 633 (suspected fibromyalgia in August 2016).  This express finding and recognition of fibromyalgia as a severe impairment distinguishes Plaintiff's case from *Garza v. Barnhart*, 397 F.3d 1087 (8th Cir. 2005) (per curiam).

Nor is there really any dispute that Plaintiff experiences pain.  *See Hutton v. Apfel*, 175 F.3d 651, 654 (8th Cir.1999) ("As is true in many disability cases, there is no doubt that the claimant is experiencing pain; the real issue is how severe that pain is." (quotation omitted)).  The ALJ acknowledged Plaintiff's testimony at the hearing that she experiences pain in her joints and hands and that, while medications help with Plaintiff's pain, "she remains unable to be as active as she wishes."  Tr. 21; *see* Tr. 51-54 (hearing

7

testimony).   The ALJ also repeatedly referenced Plaintiff's complaints of pain when recounting the medical evidence.  Tr. 21-23.  Without intending to be insensitive to the existence of Plaintiff's pain, "the mere fact that working may cause pain or discomfort does not mandate a finding of disability."  *Perkins v. Astrue*, 648 F.3d 892, 900 (8th Cir. 2011) (quotation omitted).

And, "not every diagnosis of fibromyalgia warrants a finding that a claimant is disabled."  *Id*.  The ALJ's residual-functional-capacity determination is "an assessment of what [Plaintiff] can and cannot do, not what [s]he does and does not suffer from." *Mitchell v. Astrue*, 256 F. App'x 770, 772 (6th Cir. 2007); *see Martise v. Astrue*, 641 F.3d 909, 923 (8th Cir. 2011) (defining residual functional capacity as "the most a claimant can still do despite his or her physical or mental limitations" (quotation omitted)). Although fibromyalgia can be disabling, a diagnosis of fibromyalgia alone is not necessarily so.  The fact "[t]hat a claimant has medically-documented impairments does not perforce result in a finding of disability."  *Stormo v. Barnhart*, 377 F.3d 801, 807 (8th Cir. 2004).   "It is appropriate for the ALJ to take a 'functional approach' when determining whether impairments amount to a disability."  *Id.* (quoting *Bowen v. Yuckert*, 482 U.S. 137, 146 (1987)).  Accordingly, the question before the ALJ was the severity of Plaintiff's symptoms and their effect on her functional abilities.  *See Tennant*, 224 F.3d at 870 ("Although fibromyalgia can cause joint pain and fatigue, the issue before the ALJ was the severity of Plaintiff's fibromyalgia-related symptoms."); SSR 12-2p, 2012 WL 3104869, at *2 ("As with any claim for disability benefits, before we find that a person with [fibromyalgia] is disabled, we must ensure there is sufficient objective evidence to

support a finding that the person's impairment(s) so limits the person's functional abilities that it precludes him or her from performing any substantial gainful activity."). Thus, although framed in terms of misunderstanding the nature of fibromyalgia, Plaintiff's arguments are really about the ALJ's assessment of the intensity, persistence, and limiting effects of her pain and other symptoms, which is more properly viewed as a challenge to the ALJ's evaluation of her subjective complaints.

### D. Evaluation of Plaintiff's Subjective Complaints

As best as this Court is able to tell, Plaintiff's primary argument, which seems to spill over into the remainder of her other arguments, is that the ALJ erred in the evaluation of the intensity, persistence, and limiting effects of her symptoms, including pain.

When determining a claimant's residual functional capacity, an ALJ takes into account the claimant's symptoms, such as pain, and evaluates the intensity, persistence, and limiting effects of those symptoms. *Titles II and XVI: Evaluation of Symptoms in Disability Claims*, SSR 16-3p, 2016 WL 1119029, at *2 (Soc. Sec. Mar. 16, 2016) [hereinafter SSR 16-3p]; *see, e.g.*, *Bryant v. Colvin*, 861 F.3d 779, 782 (8th Cir. 2017) ("Part of the [residual-functional-capacity] determination includes an assessment of the claimant's credibility regarding subjective complaints.").

> In considering the intensity, persistence, and limiting effects of an individual's symptoms, [the ALJ] examine[s] the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record.

SSR 16-3p, 2016 WL 1119029, at *4. Such evaluation includes consideration of "(i) the claimant's daily activities; (ii) the duration, frequency, and intensity of the claimant's pain; (iii) precipitating and aggravating factors; (iv) the dosage, effectiveness, and side effects of medication; and (v) the claimant's functional restrictions." *Vance v. Berryhill*, 860 F.3d 1114, 1120 (8th Cir. 2017); *see* 20 C.F.R. § 404.1529(c)(3); SSR 16-3p, 2016 WL 1119029, at *7.

"Credibility determinations are the province of the ALJ, and as long as good reasons and substantial evidence support the ALJ's evaluation of credibility, [courts] will defer to [the ALJ's] decision." *Julin v. Colvin*, 826 F.3d 1082, 1086 (8th Cir. 2016) (quotation omitted); *see Hensley v. Colvin*, 829 F.3d 926, 934 (8th Cir. 2016) ("We will defer to an ALJ's credibility finding as long as the ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so." (quotation omitted)).

### 1. Examination Results

Plaintiff asserts that the ALJ erred by focusing on normal examination results given the nature of fibromyalgia and in the face of her reports of running out of pain medication, having too much pain to do much of anything, and being unable to tolerate physical therapy. Plaintiff asserts that the ALJ's "decision lacks . . . an adequate discussion as to [fibromyalgia]" and her "consistent attempts to obtain medical treatment or relief and ongoing pain despite experimentation with various medications." Pl.'s Mem. in Supp. at 16, ECF No. 25. Plaintiff further asserts that the ALJ did not explain how the objective findings were inconsistent with her subjective complaints.

As stated by the Commissioner, "[f]ibromyalgia symptoms are subject to the same analysis as other subjective complaints." Comm'r's Mem. in Supp. at 15, ECF No. 33; *see* SSR 12-2p, 2012 WL 3104869, at *5. This includes consideration of whether the objective medical evidence "substantiate[s] the person's statements about the intensity, persistence, and functionally limiting effects of [his or her] symptoms." SSR 12-2p, 2012 WL 3104869, at *5; *see* 20 C.F.R. § 404.1529(c)(2). The regulations provide that a claimant's statements about the intensity and persistence of his or her pain or other symptoms or the effect those symptoms have on the claimant's ability to work will not be rejected "*solely* because the available objective medical evidence does not substantiate [the claimant's] statements." 20 C.F.R. § 404.1529(c)(2) (emphasis added); *see* SSR 16-3p, 2016 WL 1119029, at *5; *Bernard v. Colvin*, 774 F.3d 482, 488 (8th Cir. 2014). At the same time, "[a] report of minimal or negative findings or inconsistencies in the objective medical evidence is one of the many factors . . . [that] must [be] consider[ed] in evaluating the intensity, persistence, and limiting effects of an individual's symptoms." SSR 16-3p, 2016 WL 1119029, at *5; *see Grindley v. Kijakazi*, 9 F.4th 622, 630 (8th Cir. 2021).

In evaluating the intensity, persistence, and limiting effects of Plaintiff's pain, the ALJ heavily focused on the objective medical evidence. *See* Tr. 21-24. The ALJ chronicled Plaintiff's complaints of ongoing pain in her hands, knees, joints, and back between 2014 and 2017. As part of that discussion, the ALJ described the results of imaging and other testing completed by Plaintiff's treatment providers and how those results compared to her subjective complaints. The ALJ noted instances in which the

objective medical evidence tended to support Plaintiff's subjective complaints, including, for example, imaging showing "active synovitis within the right wrist and MCP joints suggestive of inflammatory arthritis and an enlarged median nerve suggestive of carpal tunnel syndrome," "mild multilevel degenerative changes and incomplete fusion of the posterior elements of L6," "osteoarthritic changes in her left hand," and "mild degenerative joint disease in her knees"; records showing "impaired grip strength bilaterally"; and examinations finding "weakened grip strength in her hands," an antalgic gait, effusion and tenderness in her knees, and "18/18 tender points." Tr. 21-22; *see* Tr. 23.

At the same time, the ALJ correctly pointed out that there was objective medical evidence in the record that did not substantiate the intensity, persistence, and limiting effects of Plaintiff's pain to the degree alleged. The ALJ cited objective medical evidence in the form of "unremarkable examinations" and findings showing, for example, normal range of motion, full strength in her extremities, "intact sensation," "no tenderness," "no sensory deficits," and "no significant joint deformities, with no warmth, swelling, or effusion, and full range of motion in all joints." Tr. 23; *see* Tr. 22-24. The ALJ noted that these findings were observed on occasions when Plaintiff "reported continued widespread pain" and "that her pain was too great to do much of anything." Tr. 23. The ALJ also noted a treatment provider suspected that Plaintiff's "ongoing disability application was likely contributing to her reported symptoms." Tr. 23; *see* Tr. 1014.

Again, the question is not whether Plaintiff suffers from fibromyalgia or experiences pain, but the effect of Plaintiff's symptoms on her functional abilities. At bottom, Plaintiff appears to be arguing that normal, mild, or minimal examination results are irrelevant in cases of fibromyalgia. Under 20 C.F.R. § 404.1529(c), however, the ALJ was required to consider whether the intensity, persistence, and limiting effects of Plaintiff's pain were consistent with the objective medical evidence. *See* SSR 16-3p, 2016 WL 1119029, at *4 ("We must consider whether an individual's statements about the intensity, persistence, and limiting effects of his or her symptoms are consistent with the medical signs and laboratory findings of record.").

Plaintiff complains that "the ALJ did not specifically explain how the listed objective findings were inconsistent with [her] reports of pain and limitations," citing to *Moraine v. Social Security Administration*, 695 F. Supp. 2d 925, 960 (D. Minn. 2010). Pl.'s Mem. in Supp. at 16; *see* Pl.'s Mem. in Supp. at 18. In *Moraine*, it was determined "that the ALJ made a critical error, which undermine[d] his entire decision by his apparent failure to consider the Plaintiff's diagnosis of fibromyalgia in any meaningful way," which included not recognizing fibromyalgia as a severe impairment. 695 F. Supp. 2d at 954-55, 958. It was in the context of this error and "the ALJ appear[ing] to have addressed the severity of the Plaintiff's symptoms[] only in connection with the potentiality that they could be as severe as she complained[] *as a result of her diagnosis of collagenous colitis*," that *Moraine* found a lack of meaningful discussion as to normal motor strength and range of motion in the context of the claimant's fibromyalgia diagnosis. *Id.* at 958-60 (emphasis added).

13

Unlike *Moraine*, the ALJ specifically found that Plaintiff's fibromyalgia was a severe impairment, reiterating Plaintiff's "history of a diagnosis of fibromyalgia" in the discussion of the medical evidence.  Tr. 21.  As explained in SSR 16-3p:

> The intensity, persistence, and limiting effects of many symptoms can be clinically observed and recorded in the medical evidence.  Examples such as reduced joint motion, muscle spasm, sensory deficit, and motor disruption illustrate findings that may result from, or be associated with, the symptom of pain.  These findings may be consistent with an individual's statements about symptoms and their functional effects.  However, when the results of tests are not consistent with other evidence in the record, they may be less supportive of an individual's statements about pain or other symptoms than test results and statements that are consistent with other evidence in the record.

2016 WL 1119029, at *5 (footnote omitted).  When evaluating Plaintiff's subjective complaints, the ALJ did not err by considering objective medical evidence showing that the intensity, persistence, and limiting effects of her pain were not reflected to the same degree in diagnostic testing.  *See Grindley*, 9 F.4th at 631.

## 2.  Efforts to Relieve Pain

Plaintiff additionally asserts that the ALJ did not adequately discuss her "consistent attempts to obtain medical treatment or relief and ongoing pain despite experimentation with various medications."  Pl.'s Mem. in Supp. at 16.  According to Plaintiff, "the ALJ did not explain why [her] consistent attempts to obtain medical treatment, or her ongoing pain despite experimenting with various medications, warranted discrediting her subjective complaints of pain."  Pl.'s Mem. in Supp. at 28.  Plaintiff similarly asserts that "the ALJ viewed Tramadol in the context of use or overuse,

without recognizing that despite strong narcotic pain medications, [she] was not obtaining adequate pain relief." Pl.'s Mem. in Supp. at 28.

When evaluating a claimant's subjective complaints, factors relevant to the intensity, persistence, and limiting effects of a claimant's symptoms include the effectiveness of medication and any other treatment other than medication a claimant receives to alleviate pain or other symptoms. 20 C.F.R. § 404.1529(c)(3)(iv), (v); *see also Vance*, 860 F.3d at 1120; SSR 16-3p, 2016 WL 1119029, at *7. In discussing the intensity, persistence, and limiting effects of Plaintiff's pain, the ALJ noted that Plaintiff's current medications include oxycodone, Lyrica, and medical cannabis and that Plaintiff testified that these "medications help with her pain, but she remains unable to be as active as she wishes." Tr. 21; *see* Tr. 51-52. Among other things, the ALJ noted that, during the relevant period, Plaintiff participated in physical therapy, was treated with anti-inflammatory medications, received knee injections, wore knee braces, and underwent arthrocentesis. Tr. 22-23.

The ALJ also discussed Plaintiff's use of Tramadol, an opiate.[3] The ALJ pointed to places in the record where Plaintiff "expressed frustration with not being prescribed opioids." Tr. 23; *see, e.g.*, Tr. 952, 972. The ALJ also noted that Plaintiff made "repeated requests for Tramadol." Tr. 23; *see, e.g.*, Tr. 982 ("she brings up on multiple occasions her request for more tramadol"), 986 ("Carla comes in today to establish care.

---

[3] "Tramadol is used to relieve moderate to moderately severe pain. Tramadol extended-release tablets and capsules are only used by people who are expected to need medication to relieve pain around-the-clock. Tramadol is in a class of medications called opiate (narcotic) analgesics." *Tramadol*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a695011 html (last accessed Jan. 18, 2022). "It works by changing the way the brain and nervous system respond to pain." *Id.*

15

Her biggest concern is her knee pain and someone to prescribe Tramadol as her rheumatologist will not.").  At the time of these requests, notwithstanding Plaintiff's complaints of ongoing pain, the record showed largely normal examination results with minimal findings.  Tr. 23; *see* Tr. 968-1019.  Plaintiff continued to take more than her prescribed dose and ran out of medication early.  Tr. 23; *see, e.g.*, Tr. 1004, 1019.  "[M]isuse of medication is a valid factor in an ALJ's credibility determinations." *Chaney*, 812 F.3d at 677 (quotation omitted); *accord Grindley*, 9 F.4th at 630.  While Plaintiff asserts that this is evidence of uncontrolled pain, there is substantial evidence in the record to support the ALJ's conclusion that Plaintiff was misusing her medication. *See Chaney*, 812 F.3d at 677; *see also Grindley*, 9 F.4th at 630-31.

### 3.  Daily Activities

Plaintiff next asserts that the ALJ did not properly consider her daily activities, misreading a statement made to the psychological consultative examiner and then "focus[ing] on this isolated report as to functioning."  Pl.'s Mem. in Supp. at 25.  The Court agrees.

### a.  Consultative Examination

During a psychological consultative examination in September 2017, Plaintiff was asked about her daily activities.  Plaintiff stated that she and her husband lived in the lower level of her parents' home.  Tr. 941.  During a typical day, Plaintiff would "wake up her 13-year-old [son with autism spectrum disorder] and oversee him getting ready for school and catching the bus," including "supervis[ing] him taking his medications and feed[ing] him a breakfast."  Tr. 942.  Plaintiff described her son as "a difficult child" who

16

"needs regular monitoring for self-care including hygiene-related needs." Tr. 942. Plaintiff then "la[id] back down for 45 minutes to an hour," after which she would have a light breakfast, "usually a banana or yogurt." Tr. 942. Plaintiff usually "snack[ed] on things lightly for lunch." Tr. 942.

Plaintiff told the consultative examiner that her day varies depending on how she feels and how much pain she is in." Tr. 942. Plaintiff's husband "d[id] most of the household chores 'for [her]. He vacs and does a lot of the dishes and things like that.'" Tr. 942; *see also* Tr. 946 ("She does some domestic chores on a limited basis depending on pain levels during the day, but her husband does the bulk of domestic chores."). Plaintiff also spent time reading the newspaper and the Bible in the morning. Tr. 942. Plaintiff additionally reported that

> [s]he will try to help her husband with chores depending on the day and she may help with such things as picking up the living room, helping him clean the garage as best she can. She said that her parents live upstairs and she will go upstairs to make sure her dad has his snacks and other things during the day although she said stairs are difficult for her.

Tr. 942; *see also* Tr. 943. Plaintiff noted that sometimes she has "had to crawl up [her] parents' steps to help [her] dad." Tr. 943. When Plaintiff's son came home from school, she "check[ed] his homework." Tr. 942.

Plaintiff enjoyed cooking and "will make supper for everybody in the house making a full meal." Tr. 942. Although she is able to prepare this meal, "she cannot do the dishes or other tasks that require extended fine motor functioning." Tr. 942. Plaintiff's mother and husband did the dishes. Tr. 942. Plaintiff reported that "she

typically goes at a slow pace and sometimes has to [take] breaks if she is on her feet very long." Tr. 942. "In the evening [Plaintiff] and her husband will do some reading and visiting." Tr. 943.

In particular, the consultative examiner wrote:

> She said her husband is trying to introduce her to new hobbies particularly outdoor hobbies including four-wheeling or riding a tractor. She said that she is able to work outside on a riding lawn mower picking up leaves and said, 'I really like that. He does all the other stuff and like he'll vacuum and plow and do the lawn, but I like picking up the leaves.

Tr. 943. Plaintiff also "like[d] to tend flowers and read and particularly likes to sing," which she did at her church. Tr. 943.

### b. Hearing Testimony

At the hearing, Plaintiff testified that she and her now 15-year-old son continued to live with her parents.[4] Tr. 45, 58; *see* Tr. 59-60. Plaintiff testified that she is able to drive and drives two to three days per week to go to the grocery store, take her son to work, and attend medical appointments. Tr. 45-56, 55. Plaintiff testified that she gets "easily overwhelmed with a lot of traffic going out of town" to unfamiliar places and gets sleepy when driving for more than 45 minutes. Tr. 46.

Among other things, Plaintiff testified that she has pain particularly in her hands and arms. Tr. 51. As an examples, Plaintiff testified that she has difficulty washing dishes and her father takes care of them. Tr. 53. While Plaintiff is able to perform her own personal care, she prefers items without buttons or zippers, uses a battery-powered

---

[4] Plaintiff separated from her husband in or around May 2019. Tr. 58; *see* Tr. 57.

toothbrush, and keeps her hair permed to minimize styling. Tr. 53. Plaintiff testified that if she grabs a gallon of milk from the refrigerator, she needs to use two hands, one on the handle and the other supporting the jug from the bottom, in order to carry it "or [her] right wrist or [her] elbow would give out." Tr. 54. Plaintiff additionally testified that it can be hard to prepare meals due to pain, so she "usually only ha[s] one big meal, which would be supper." Tr. 55.

Plaintiff further testified that, in the two years leading up to 2018, she attended church and sang with the worship team. Tr. 57. She subsequently stopped attending following the breakdown of her marriage. Tr. 58.

### c. ALJ's Reliance on Plaintiff's Activities

When discussing the physical aspects of the residual-functional-capacity determination, the ALJ noted that Plaintiff "was eventually prescribed Tramadol as needed, but despite the[] benign findings and the claimant's *reported activities*, she took more Tramadol than prescribed and claimed she was unable to tolerate physical therapy." Tr. 23 (emphasis added). It is unclear from the ALJ's decision what/which "reported activities" are being referred to. While there is no citation record, the Court believes this sentence is in reference to an urgent care visit with Julie Gerig, M.D., for knee pain at the end of August 2017. *See* Tr. 1006-09. During this visit, Plaintiff complained of ongoing knee pain and had run out of Tramadol following an emergency room visit for knee pain the week prior. Tr. 1006; *see* Tr. 995-1005. While treatment notes indicate that Plaintiff's pain "is worse when she has been very active," Tr. 1006, no particular activities were mentioned as a measure of Plaintiff's activity. *See* Tr. 1006-07.

19

Later in the same paragraph, as additional reasoning for the ALJ's conclusion that the intensity, persistence, and limiting effects of Plaintiff's pain were not entirely consistent with other evidence in the record, the ALJ noted that "at her September 2017 psychological consultative examination, the claimant stated that she had begun to take up hobbies such as four-wheeling and riding a tractor. She said she did yard work, including picking up leaves and riding a riding lawn mower." Tr. 24. True, Plaintiff reported tending flowers and picking up leaves *with* a riding lawn mower—activities which could be described as yardwork. But, Plaintiff also told the psychological consultative examiner that her husband handled *all* of the other yardwork. Similarly, while Plaintiff's husband was *encouraging* her to try four-wheeling or riding a tractor as hobbies, Plaintiff did not report that she "had begun to take up [these] hobbies." Tr. 24.

When addressing aspects of Plaintiff's mental residual functional capacity, the ALJ noted Plaintiff's care of her son; her attendance at church, including her participation with the worship team; and her enjoyment of cooking, including "mak[ing] entire meals for the family." Tr. 25. The ALJ additionally noted that Plaintiff could "help[] with chores around the house, limited only by pain." Tr. 25.

When evaluating the opinion evidence, the ALJ again relied on Plaintiff's "ab[ility] to take up hobbies such as four-wheeling and riding a tractor" and "d[o] yard work, including picking up leaves and riding a riding lawn mower," Tr. 26; *see also* Tr. 28, as a basis to find that opinions from treating providers regarding Plaintiff's physical limitations "overstate[d her] limitations, and . . . thus [were] not consistent with the overall record," Tr. 27.

### d. Personal Activities in Fibromyalgia Cases

In the context of fibromyalgia cases, the Eighth Circuit has "repeatedly stated that a person's ability to engage in personal activities such as cooking, cleaning, and hobbies does not constitute substantial evidence that he or she has the functional capacity to engage in substantial gainful activity." *Kelley*, 133 F.3d at 589-60; *accord Brosnahan v. Barnhart*, 336 F.3d 671, 677 (8th Cir. 2003); *see also Forehand v. Barnhart*, 364 F.3d 984, 988 (8th Cir. 2004) ("Forehand's ability to engage in some life activities, however, does not support a finding that she retains the ability to work."). Here, in the context of Plaintiff's fibromyalgia and other severe impairments, the ALJ essentially relied on Plaintiff's ability to do just that—engage in some cooking (preparing one meal per day for her family); cleaning (performing limited household chores); and hobbies (picking up leaves with a riding lawn mower) to conclude that she had the ability to engage in full-time work.

Nor is the ALJ's conclusion that Plaintiff had taken up four-wheeling and riding a tractor supported by the record. The evidence cited by the ALJ to support that Plaintiff engaged in these hobbies was the psychological consultative examiner's report, which indicated at most that Plaintiff had attempted these activities, not that she engaged in them on a regular and sustained basis. The Commissioner contends that "[w]hether Plaintiff was contemplating these hobbies or had actually taken them up, Plaintiff never said or reported that she could not do them." Comm'r' Mem. in Supp. at 8. While the Commissioner contends the fact that "Plaintiff presented the hobbies as viable" was "significant," Comm'r's Mem. in Supp. at 8, this argument runs counter to Eighth Circuit

jurisprudence regarding fibromyalgia cases and the ability to engage in hobbies as constituting substantial evidence that a claimant has the residual functional capacity to engage in substantial gainful activity. *See Brosnahan*, 336 F.3d at 677; *Kelley*, 133 F.3d at 589-60.

The Commissioner likens this case to *Mess v. Colvin*, No. C15-1013-LRR, 2016 WL 2858532 (N.D. Ia. May 16, 2016), *report and recommendation adopted*, 2016 WL 3264178 (N.D. Ia. June 14, 2016). Like Plaintiff, the claimant in *Mess* also alleged disability on the basis of fibromyalgia, among other things. 2016 WL 2858532, at *1. When considering the intensity, persistence, and limiting effects of Mess's pain, the ALJ likewise considered Mess's activities in light of his allegations of disabling pain. *Id.* at *10-11. The record reflected that Mess "told a consultative examiner that he could climb ladders, kneel, and crawl. He said he could lift up to one hundred pounds and carry twenty pounds for a couple city blocks." *Id.* at *10. Mess "fished, went to movies, and played video games with his friends. He said that bowling in a league did not bother his back. [He] was also able to drive and shop in stores. He even considered riding a horse." *Id.* at *11 (citations omitted); *see id.* (mother "noted that [Mess] went bowling twice a week"). It was in the context of these activities that the district court in *Mess* observed that "[s]uch activities, especially riding a horse, are inconsistent with disabling pain and weigh against [Mess's] credibility." *Id.* Mess's reported abilities and the extent of his activities are easily distinguishable from this case.

### e. Impact on Evaluating Opinion Evidence

Further, the impact of the ALJ's imprecise description of Plaintiff's activities and reliance on her purported ability to "take up hobbies such as four-wheeling and riding a tractor" and perform "yardwork, including picking up leaves and riding a riding lawn mower," Tr. 26, also played a central role in the ALJ's evaluation of the opinion evidence regarding Plaintiff's physical residual functional capacity.

Timothy J. Buckley, D.O., treated Plaintiff for "several years," Tr. 635, and provided a number of opinions regarding Plaintiff's ability to function. In letters written in March 2016, Buckley opined that, due to "severe rheumatoid arthritis, chronic pain, severe back pain, neck, elbow and patellofemoral pain, [Plaintiff] is unable to use her hands in a repetitive manner or even for fine manipulation." Tr. 636. Approximately two weeks later, Buckley opined in another letter that Plaintiff "really should not be doing any kind of lifting as that is likely to aggravate her [chronic intractable back pain]." Tr. 637. In a return-to-work form completed in April 2016, Buckley opined that Plaintiff was limited to sedentary work due to back pain and rheumatoid arthritis. Tr. 639. Plaintiff could sit between one and four hours and drive between one and four hours, but no standing/walking. Tr. 639. Plaintiff could perform no manipulative activities with her hands or postural activities. Tr. 639.

In August 2016, Buckley completed a physical-residual-functional-capacity-assessment form. Buckley similarly opined that Plaintiff could lift less than 10 pounds. Tr. 628. Plaintiff could stand/walk for less than two hours and needed to have the option to alternate between sitting and standing. Tr. 628. Plaintiff was limited in the use of her

upper extremities and "should not push/pull at all." Tr. 628. Plaintiff was also limited in use of her lower extremities due to knee pain. Tr. 628. Buckley attributed these limitations to Plaintiff's severe rheumatoid arthritis and low back pain. Tr. 628. Plaintiff could occasionally balance, stoop, kneel, and crouch, but never climb ramps/stairs/ladders/ropes/scaffolds or crawl. Tr. 629. Due to rheumatoid arthritis and back pain, Plaintiff was limited in her abilities to reach, handle, and finger. Tr. 630. Plaintiff was unlimited in her ability to feel. Tr. 630. Plaintiff was to avoid even moderate exposure to all environmental conditions and required a climate-controlled working environment because of her rheumatoid arthritis. Tr. 631. Buckley wrote that Plaintiff was not responding well to medications for her rheumatoid arthritis, and her symptoms "remain[ed] severe and unchanged." Tr. 633. Buckley also noted Plaintiff was "prescribed many pain medications for pain control." Tr. 633. Buckley suspected that Plaintiff "also has fibromyalgia." Tr. 633.

In a third letter in March 2017, Buckley wrote, among other things, that Plaintiff continued to have "trouble with her hands," including pain. Tr. 635. Buckley wrote that, while Plaintiff "is able to maintain activities of daily living," "it is even difficult for her to do any type of home management, even light housekeeping." Tr. 635.

Douglas W. White, M.D., treated Plaintiff for rheumatoid arthritis in 2017. *See, e.g.*, Tr. 968, 981-85. In October 2017, Dr. White wrote a letter indicating that Plaintiff "avoid[] repetitive lifting beyond 5 pounds in the workplace"; "any employment that required [Plaintiff] to sit for more than an hour or walk and stand for more than 20 minutes without frequent breaks would be ill advised"; Plaintiff could expect to "continue

24

to have difficulties with grasping and fine motor control"; "unrestricted elbow extension bilaterally" would limit Plaintiff's ability to reach; and Plaintiff would experience decreased concentration secondary to fatigue. Tr. 1033. Dr. White also noted that he "d[id] not find it surprising that [Plaintiff was] unable to stoop" following a back injury in 2015. Tr. 1032.

Devin S. Wenrich, M.D., treated Plaintiff for knee pain beginning in August 2017. Tr. 986, 1038; *see, e.g.*, Tr. 1010-15. Dr. Wenrich wrote a letter in or around October 2017, opining Plaintiff's pain causes difficulty concentrating and "[h]er knee pain limits her ability to do much at this time." Tr. 1038.

The ALJ found the opinions of each of these treating providers to be unpersuasive based primarily on the objective medical evidence and Plaintiff's purported ability to "take up hobbies such as four-wheeling and riding a tractor" and perform "yardwork, including picking up leaves and riding a riding lawn mower." Tr. 28.

### E. Conclusion

Ultimately it maybe that the intensity, persistence, and limiting effects of Plaintiff's symptoms, including pain, are not substantiated to the degree alleged by the record as a whole, including the objective medical evidence, Plaintiff's daily activities, her medication non-compliance, and any other relevant evidence. But, given (a) the nature of fibromyalgia; (b) Eighth Circuit precedent regarding a claimant's ability to engage in limited personal activities in cases of fibromyalgia as not necessarily being reflective of a claimant's ability to engage in substantial gainful activity; and the imprecise manner in which Plaintiff's activities were described, the Court finds the ALJ's

analysis of the intensity, persistence, and limiting effects of Plaintiff's pain in determining she retained the residual functional capacity to perform a limited range of light work to be wanting.

Accordingly, the Court recommends that Plaintiff's motion be granted in part and denied in part; the Commissioner's motion be denied; the ALJ's residual-functional-capacity determination[5] and decision be vacated as to steps four and five; and this matter be remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

[Continued on next page.]

---

[5] Because the Court has recommended that the ALJ's residual-functional-capacity determination and decision as to steps four and five be vacated on grounds related to Plaintiff's physical residual functional capacity, the Court declines to address the remainder of Plaintiff's challenges to the ALJ's residual functional capacity determination.

## IV. RECOMMENDATION

Based upon the record, memoranda, and the proceedings herein, and for the reasons stated above, **IT IS HEREBY RECOMMENDED** that:

1. Plaintiff's Motion for Summary Judgment, ECF No. 24, be **GRANTED IN PART** and **DENIED IN PART**.

2. The Commissioner's Motion for Summary Judgment, ECF No. 32, be **DENIED**.

3. The ALJ's residual-functional-capacity determination and decision be **VACATED** as to steps four and five.

4. This matter be **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

Dated: January___21_____, 2022        _____*s/ Tony N. Leung*_____
                                      Tony N. Leung
                                      United States Magistrate Judge
                                      District of Minnesota


                                      *Carla J. H. v. Kijakazi*
                                      Case No. 20-cv-2035 (DSD/TNL)


## <u>NOTICE</u>

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in LR 72.2(c).